NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESY CRUZ; LUIS RODRIGUEZ; AND MERCEDES TRINIDAD: *on behalf of themselves and all other persons similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JMC HOLDINGS, LTD. d/b/a DOMINO'S PIZZA; JOHN CILMI; and JOHN DOES #1-10,<br><br>*Defendants*. | Civil No.: 16-9321 (KSH) (CLW)<br><br>**Opinion** |

**Katharine S. Hayden, U.S.D.J.**

## I. Introduction

Plaintiffs Jesy Cruz ("Cruz"), Luis Rodriguez ("Rodriguez"), and Mercedes Trinidad ("Trinidad") (collectively, the "named plaintiffs") filed this collective action against defendants JMC Holdings d/b/a Domino's Pizza and John Cilmi (collectively, "JMC") on behalf of themselves and others similarly situated for alleged violations of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq.*, and the New Jersey Wage and Hour Law (the "NJWHL"), N.J.S.A. 34:11-56a *et seq.* (D.E. 1. ("Compl.").) This matter comes before the Court on named plaintiffs' consent motion for settlement as to all plaintiffs. (D.E. 34 ("Consent Motion").) As set forth below, the motion is granted.

## II. Background

### A. The FLSA Allegations

Plaintiffs allege that JMC owned and operated at least a dozen Domino's pizza stores in the states of New Jersey and New York. (Compl. ¶ 31.) Cruz and Rodriguez worked at a store located at 527 High Mountain Road, North Haledon, New Jersey, and Trinidad worked at a store located at 500 McBride Avenue, Woodland Park, New Jersey. (*Id.* ¶¶ 31, 34.) According to

plaintiffs, every store owned by JMC was operated pursuant to "common employment policies, set by [JMC's] upper management" and not by the managers of the individual stores. (*Id.* ¶ 32.)

Plaintiffs allege that they were employed as pizza delivery drivers by JMC. (*Id.* ¶ 33.) Along with delivering pizzas, plaintiffs assert that at the end of the day they also spent time "closing out the store after their delivery shifts," referred to as "inside work." (*Id.*) Plaintiffs maintain that JMC paid them at two rates depending on the type of work. (*Id.* ¶ 43.) They allege they were paid between $5.00 and $7.00 per hour for delivery duties, and for inside work they claim they were paid either their delivery rate or between $9.00 and $10.00 per hour. (*Id.*)

Plaintiffs assert that they also sometimes received tips from delivery customers. (*Id.* ¶ 44.) But they claim that JMC never provided them notice or information regarding a "tip credit" that it purportedly took. (*Id.* ¶ 45.) Plaintiffs contend that JMC did not keep accurate records of the tips they received. (*Id.* ¶ 46.)

Plaintiffs further allege that JMC conditioned their employment on their using their own vehicles as "tools of the trade" to complete deliveries, because its model relied on "making quick deliveries to customers while their food was still hot." (*Id.* ¶¶ 47-48.) Plaintiffs assert that in making deliveries, they "incurred expenses for, *inter alia*, gasoline, maintenance, and wear-and-tear of their vehicles." (*Id.* ¶ 49.) According to plaintiffs, JMC failed to reimburse them for the actual expenses for these "tools of the trade." (*Id.* ¶ 50.) Because JMC did not reimburse their actual expenses, plaintiffs allege JMC did not "ask or tell" them to keep records. (*Id.* ¶ 51.)

Plaintiffs assert that JMC's lack of records was designed to help it implement a policy pursuant to which it only paid them a "token flat per-delivery amount" of $1.00 as expense reimbursement despite charging customers "between $3.00 and $4.00 per delivery." (*Id.* ¶ 52.) To disguise this policy, plaintiffs contend that JMC paid the expense reimbursement each day as

cash and without paper records. (*Id.* ¶ 53.) According to plaintiffs, JMC's reimbursement rate was approximately $0.15 per mile or less, whereas, at the time, the Internal Revenue Service recommended a rate between $0.54 and $0.575 per mile for operating a vehicle. (*Id.* ¶ 55.)

Plaintiffs conclude that, because JMC allegedly paid them less than the statutory minimum wage when making deliveries and did not adequately reimburse them for their actual expenses, their actual compensation, "free and clear," was less than minimum wage. (*Id.* ¶ 56.) They further contend that JMC's failure to properly reimburse them for their expenses resulted in them being paid overtime at a rate that was "less than one-and-one-half the appropriate rates of pay." (*Id.* ¶ 57.)

In light of these alleged employment practices, on December 16, 2016, named plaintiffs bought this action against JMC alleging that it violated the FLSA and NJWHL by failing to pay them and other similarly situated employees—current or former delivery drivers employed by JMC on or after December 14, 2014—a "free and clear" minimum wage and time-and-one-half for overtime hours worked. (*Id.* ¶¶ 20, 62-63.) Twenty-four additional individuals have filed consents to join the action. (D.E. 3 to 26.) On January 22, 2019, named plaintiffs filed the instant consent motion requesting the Court to approve the settlement agreement (the "Settlement Agreement"), which the parties reached after engaging in mediation at JAMS with a mediator experienced in wage-and-hour class action matters. (Consent Motion.)

### B. The Settlement Agreement

Pursuant to the Settlement Agreement, JMC will pay a "Maximum Settlement Amount" of $44,750.00. (D.E. 34-1 ("Settlement Agreement") ¶ 1.16.) Named plaintiffs' counsel requests $19,271.83 of the Maximum Settlement Amount as attorneys' fees and costs, (*id.* ¶ 3.2(A)) and named plaintiffs seek $3,000.00 each as a service award for their prosecution of this action (*id.* ¶ 3.3(A)). The remaining $16,478.17 will be distributed to all plaintiffs proportionally by dividing

3

each plaintiff's "number of hours worked by total number of hours worked by all" plaintiffs during the time period covered by the collective action.[1] (*Id.* ¶ 3.4(B), (D).)

## III. Discussion

### A. Settlement Under the FLSA

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013). "Generally, an employer must pay its employees at least a specified minimum hourly wage for work performed, 29 U.S.C. § 206, and must pay one and one-half times the employer's regular wage for hours worked in excess of forty hours per week." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (citing 29 U.S.C. § 207). "Employers who violate these provisions are 'liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.'" *Id.* (quoting 29 U.S.C. § 216(b)). The FLSA expressly grants an employee the right to bring claims as collective actions, but in contrast to a class action under Fed. R. Civ. P. 23, plaintiffs must "opt in" to be a party to the action and bound by any judgment. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."); *Bredbenner v. Liberty Travel, Inc.*, No. 09-1248, 2011 WL 1344745, at *18 (D.N.J. Apr. 8, 2011) (Falk, Mag. J.) ("Unlike a traditional class action under Rule 23, potential class members in an FLSA collective action must affirmatively opt-in to be bound by the judgment.").

---

[1] Plaintiff Edward Puello will not receive a distribution because he previously entered into a settlement supervised by the Department of Labor and released his claims against JMC. (*Id.* ¶ 3.4(B).)

In the Third Circuit, district courts have held that FLSA claims can be settled by two means: "(1) with the Department of Labor supervising the payment of unpaid minimum wages or overtime compensation pursuant to 29 U.S.C. § 216(c); or (2) with the district court's approval of a settlement under 29 U.S.C. § 216(b)." *Davis v. Essex Cnty.*, No. 14-1122, 2015 WL 7761062, at *2 (D.N.J. Dec. 1, 2015) (Cecchi, J.); *accord Rabbenou v. Dayan Foods, Ltd.*, No. 17-1330, 2017 WL 3315263, at *1 n.1 (D.N.J. Aug. 3, 2017) (Salas, J.). "Although the Third Circuit has not addressed whether such § 216(b) actions claiming unpaid wages may be settled privately without first obtaining court approval, district courts within the Third Circuit have followed the majority position and assumed that judicial approval is necessary." *Bettger v. Crossmark, Inc.*, No. 13-2030, 2015 WL 279754, at *3 (M.D. Pa. Jan. 22, 2015).[2]

In approving an FLSA settlement agreement in the Third Circuit, a district court must find "that the compromise reached 'is a fair and reasonable resolution of a bona fide dispute over FLSA provisions.'" *Brumley v. Camin Cargo Control, Inc.*, No. 08-1798, 2012 WL 1019337, at *2 (D.N.J. Mar. 26, 2012) (Linares, J.) (citing *Lynn's Food Stores. Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982)).[3] "A proposed settlement resolves a 'bona fide dispute' when it 'reflect[s] a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute,' rather than 'a mere waiver of statutory rights brought about by

---

[2] The parties have not asked the Court to approve the settlement as it relates to the NJWHL claims. Nor is the Court's approval necessary because "court approval of a settlement of those state law claims is not required." *Davis*, 2015 WL 7761062, at *2 n.1.

[3] "Courts typically employ the considerations set forth by the Eleventh Circuit in *Lynn's Food Stores*, 679 F.2d 1350, when evaluating proposed FLSA settlement agreements." *Haley v. Bell-Mark Techs. Corp.*, No. 17-1775, 2019 WL 1925116, at *2 (M.D. Pa. Apr. 30, 2019); *see, e.g.*, *Sierra v. Ottoman Rest., Inc.*, No. 19-20689, 2019 WL 2269737 (S.D. Fla. Apr. 23, 2019); *Stayler v. Rohoho, Inc.*, No. 16-1235, 2019 WL 1491873 (D.S.C. Apr. 4, 2019); *Gonzalez v. CoreCivic of Tennessee, LLC*, No. 16-01891, 2018 WL 4388425 (E.D. Cal. Sept. 13, 2018); *Brumley*, 2012 WL 1019337.

an employer's overreaching.'" *Davis*, 2015 WL 7761062, at *2 (alteration in original) (quoting *In re Chickie's & Pete's Wage & Hour Litig.*, No. 12-6820, 2014 WL 911718, at *2 (E.D. Pa. Mar. 7, 2014)). A proposed settlement is fair and reasonable when it (i) "is fair and reasonable to the employee," and (ii) does not "otherwise frustrate[] the implementation of the FLSA." *Id.*

### B. Certification of the FLSA Class

The parties request the Court to approve a settlement that resolves an FLSA collective action. Thus the Court must first certify the FLSA class. *Id.* at *3; *see also Burkholder v. City of Ft. Wayne*, 750 F. Supp. 2d 990, 993 (N.D. Ind. 2010) ("Indeed, where the parties reach settlement after a court has conditionally certified a collective class, the court still must make some final class certification before approving a collective action settlement." (citation and internal quotation marks omitted)). A court must find that the employees in the class are "similarly situated" before certifying a collective action under the FSLA. *See Sperling v. Hoffman-La Roche Inc.*, 862 F.2d 439, 444 (3d Cir. 1988) (explaining that employees must be "similarly situated" for a collective action under the FLSA), *aff'd*, *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989). "The 'factors to reach a final determination on class certification under the FLSA . . . include (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [defendants] which appear to be individual to each plaintiff, [and] (3) fairness and procedural considerations.'" *Atis v. Freedom Mortg. Corp.*, No. 15-03424, 2018 WL 5801544, at *8 (D.N.J. Nov. 6, 2018) (Kugler, J.) (alterations in original) (quoting *Bredbenner*, 2011 WL 1344745, at *17). These criteria are not exhaustive nor are they mandatory. *See Ruehl v. Viacom, Inc.*, 500 F.3d 375, 389 n.17 (3d Cir. 2007).

The Court certifies the collective action because the putative class members are similarly situated as contemplated by § 216(b) of the FLSA. First, the factual circumstances underpinning each putative class member's claim is similar. They are all delivery drivers who claim they were

compensated below federal and state minimum wages (Compl. ¶ 60), and they allege that JMC failed to pay them a "free and clear" minimum wage by not fully reimbursing for their "tools of the trade" and not paying them one-and-a-half their regular rate of pay for all overtime hours worked (*id.* ¶¶ 61-63). The putative class members are therefore similarly situated to named plaintiffs. *See Davis*, 2015 WL 7761062, at *3 (concluding that putative class members were "similarly situated" to the class representatives because they "held the same job, worked overtime during the relevant class period, and each claims the same relief under the FLSA"). Second, there does not appear to be any individual defenses that would interfere with certification. Last, as discussed below, the proposed settlement is fair.

### C. Fairness of the Settlement

#### 1. There is a Bona Fide Dispute

"A *bona fide* dispute exists when parties genuinely disagree about the merits of an FLSA claim—when there is factual rather than legal doubt about whether the plaintiff would succeed at trial." *Haley v. Bell-Mark Techs. Corp.*, No. 17-1775, 2019 WL 1925116, at *4 (M.D. Pa. Apr. 30, 2019). Plaintiffs maintain (i) that JMC was not entitled to take advantage of a "tip credit" because it failed to provide them with the legally mandated disclosures that are a perquisite to taking such a credit; and (ii) that they did not receive a "free and clear" minimum wage or overtime pay at one-and-a-half times the required rate of pay because they were not being fully reimbursed for their expenses. (Consent Motion at 2.) By contrast, JMC contends that it owes plaintiffs nothing because it (a) properly informed all employees about the "tip credit"; and (b) adequately reimbursed employees for their expenses, satisfying "the minimum wage and overtime provisions of the law." (*Id.*) In light of the parties' diametrically opposed factual positions, the Court finds that a bona fide dispute exists.

7

## 2. The Settlement is Fair and Reasonable

District courts in the Third Circuit examine the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) to determine whether an FLSA settlement is fair and reasonable. *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, No. 11-3121, 2017 WL 6513344, at *1 (D.N.J. Dec. 19, 2017) (Martini, J.); *accord Brumley*, 2012 WL 1019337, at *4. Those factors are as follows:

> . . . (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

*Girsh*, 521 F.2d at 157 (alterations in original) (citation and internal quotation marks omitted).

An examination of the *Girsh* factors establishes that the proposed settlement here is fair and reasonable.

The first "factor captures the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted). The parties still dispute a number of complex issues consisting of whether JMC informed its employees about the "tip credit," whether it sufficiently reimbursed its employees for their expenses, and whether it properly paid its employees minimum wage and overtime. Demonstrating the complexity of the issues at stake is plaintiffs' steadfast position that JMC violated the FLSA despite its voluntary production of approximately 1,400 pages of documents, which it claims prove that plaintiffs' claims are baseless. (Consent Motion at 3-4.) Given the complexity of those issues, named plaintiffs estimate that if this litigation were to proceed to a final judgment that there is a "likelihood that any recovery for . . . Plaintiffs would

8

not occur for several years." (Settlement Agreement at 2.) Accordingly, the first *Girsh* factor counsels in favor of approval because the settlement agreement obviates the expenses and complicated process that would result from prolonged litigation, which could reduce any recovery for plaintiffs. *See In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (concluding that the first *Girsh* factor supported approval of a settlement because it would prevent prolonged litigation that could reduce any recovery for the class).

"The second Girsh factor is 'the reaction of the class to the settlement.'" *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 85 (D.N.J. 2001) (Lechner, J.) (quoting *Girsh*, 521 F.2d at 157). "It is generally assumed that 'silence constitutes tacit consent to the agreement.'" *Id.* at 86 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995)). Named plaintiffs communicated with plaintiffs throughout the litigation to keep them apprised of developments (*See* Settlement Agreement ¶ 3.3(A)), and none of the other plaintiffs have objected to the proposed settlement. Thus the second factor also supports approval.

"The third factor requires the Court to consider the stage of proceedings and the amount of discovery completed." *Sawyer v. Health Care Sols. at Home, Inc.*, No. 16-5674, 2019 WL 1558668, at *4 (E.D. Pa. Apr. 10, 2019). Under this factor, a court must determine "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (citation and internal quotation marks omitted). While no depositions have been taken, JMC voluntarily produced a voluminous amount of documents regarding its employment policies, mileage reports for plaintiffs, and records that it alleges show it paid plaintiffs time-and-a-half for their overtime work and a full minimum wage for "inside work." (Consent Motion at 2.) Critically, named plaintiffs' counsel gained an adequate appreciation of the merits of the case before negotiating the settlement with JMC by engaging in

9

a full-day mediation session with a JAMS mediator experienced in wage-and-hour class action matters. (Settlement Agreement at 2.) The Court therefore finds that the third factor militates in favor of approval of the settlement. *See Fein v. Ditech Fin., LLC*, No. 16-00660, 2017 WL 4284116, at *9 (E.D. Pa. Sept. 27, 2017) (concluding that counsel appreciated the merits of the case because, among other things, the parties "engaged in various arm's-length negotiations, including a full-day mediation session" at JAMS); *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 762 (E.D. Pa. 2016) ("Based on the discovery conducted, the Court can fairly conclude that the parties had an adequate appreciation of the merits of the case before negotiating." (citation and internal quotation marks omitted)).

The fourth and fifth *Girsh* factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537. Named plaintiffs recognize the obstacles they will face to prevail at trial. They estimate that plaintiffs' collective claims could total $36,000, but concede, after analyzing JMC's document production and mediation at JAMS, that JMC has "potentially strong defenses." (Consent Motion at 4.) "The difficulties that Plaintiffs recognize cause the likelihood of success at trial to pale in comparison with the benefit of immediate settlement." *Sawyer*, 2019 WL 1558668, at *4. Accordingly, because "[t]he court must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their cause of action," *Fein*, 2017 WL 4284116, at *10 (citation and internal quotation marks omitted), the fourth and fifth factors support the settlement.

As for the sixth factor, "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *In re*

*Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 321 (3d Cir. 1998). Moreover, this factor often becomes "toothless" with settlement-only classes, such as here. *Id.* Nevertheless, named plaintiffs acknowledge that it may be difficult "to maintain the case as a class action, given the individualized questions about the applicable rate of reimbursement to which each employee was entitled." (Consent Motion at 3.) The Court therefore finds that the sixth *Girsh* factor favors approval of the parties' settlement.

"The seventh *Girsh* factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 440 (3d Cir. 2016). The parties have not offered evidence regarding JMC's ability to withstand a greater judgment. As such, the Court finds that the seventh factor is neutral. *See Galt v. Eagleville Hosp.*, 310 F. Supp. 3d 483, 495 (E.D. Pa. 2018) (concluding that the seventh *Girsh* factor was neutral because the parties did not present evidence concerning the defendant's ability to pay a greater judgment).

For the eighth and ninth *Girsh* factors, a court asks "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. After deducting attorneys' fees, costs, and service awards from the $44,750.00 Maximum Settlement Amount, $16,478.17 remains to be distributed to plaintiffs proportionally by dividing each plaintiff's "number of hours worked by total number of hours worked by all" plaintiffs during the time period covered by the collective action. (Settlement Agreement ¶ 3.4(B), (D).) This total represents 45% of the $36,000.00 that named plaintiffs estimate plaintiffs' collective claims to be worth if they were to fully succeed on the merits.[4] But named plaintiffs recognize that JMC

---

[4] Courts have approved settlements representing lower percentages of provable damages. *See, e.g.*, *Mehling v. New York Life Ins. Co.*, 248 F.R.D. 455, 462 (E.D. Pa. 2008) (finding a settlement amount reasonable that "represent[ed] approximately 20% of the 'best possible' recovery if all

possesses potentially strong defenses and that they might not succeed at trial, or that if they proceeded to trial, any recovery would be significantly eclipsed by the costs of the litigation. (*Id.* at 2.) The settlement amount is therefore reasonable to resolve plaintiffs' claims. To be sure, "there is always a chance for greater recovery at trial," but here, "the benefits of the present settlement outweigh the risks of continued litigation." *Sawyer*, 2019 WL 1558668, at *5. Accordingly, the eighth and ninth *Girsh* factors favor approval of the settlement.

In short, an analysis of the *Girsh* factors supports approval of the settlement, and thus the Court finds that it is fair and reasonable.

### 3. The Settlement Does Not Frustrate the Purposes of FLSA

JMC argues that it informed plaintiffs about the "tip credit" and sufficiently reimbursed them for their expenses so as to satisfy minimum wage and overtime laws. (Consent Motion at 2.) In pursuing the class's claims, which JMC disputes, named plaintiffs maintain that they "have analyzed extensive payroll, mileage reimbursement data as well as policy and other documents produced by" JMC. (Settlement Agreement at 2.) After analyzing and evaluating their claims against JMC and engaging in mediation, named plaintiffs concede that, if this action is not settled now, they might not recover any of their claimed damages or might obtain a more favorable recovery than originally sought, but there is a likelihood that any recovery would not occur for several years. (*Id.*) In light of the complex issues raised by plaintiffs' claims and the anticipated

---

theories of recovery and damages were accepted by the Court"); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 490 (E.D. Pa. 2003) ("A settlement amounting to 15% of maximum provable damages is within the range of settlement agreements approved by other courts in this District."); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144 (E.D. Pa. 2000) ("The settlement that was achieved represents approximately seventeen percent of single damages to the class, an amount significantly higher than the proportion of damages obtained in settlement agreements approved by other courts.").

time-consuming litigation, the Court finds that a settlement will resolve a bona fide dispute without undermining the purposes of the FLSA.

In addition, district courts require plaintiffs to limit the scope of any waiver or release clause in FLSA settlement agreements to "claims related to the specific litigation." *Singleton v. First Student Mgmt. LLC*, No. 13-1744, 2014 WL 3865853, at *9 (D.N.J. Aug. 6, 2014) (Irenas, J.); *see also Brumley*, 2012 WL 1019337, at *8 ("The Supreme Court and lower courts have consistently rejected broad waivers of FLSA rights . . . ."). As such, courts faced with overly broad release provisions in FLSA settlement agreements will excise them before approving the settlement agreement. *See, e.g.*, *Bettger*, 2015 WL 279754, at *9 ("The court finds the release provisions inappropriately comprehensive; the provisions preclude Bettger from raising any and all claims she may have against Crossmark arising prior to the execution date of the agreement and require her to dismiss any charges of discrimination, harassment, or retaliation currently pending with any government agency."); *Brumley*, 2012 WL 1019337, at *8 (refusing to enforce a release provision that was overly broad because it incorporated claims related to any future violations of the FLSA that the defendants may commit).

>The Settlement Agreement here contains a release provision, which provides as follows:
>
>By operation of the approval of this Agreement and dismissal of the Action with prejudice, and except as to such rights or claims as may be created by this Agreement, each individual Plaintiff forever and fully releases [JMC] from any and all Released Claims.

(Settlement Agreement ¶ 4.1(A).) The Settlement Agreement defines Released Claims as:

> all claims asserted under federal wage and hour law and New Jersey Wage & Hour Law by and on behalf of the Plaintiffs for the period ending on the Effective Date. The Released Claims include any and all claims under the Fair Labor Standards Act and related regulations pursuant to such laws, and any other federal law relating to failure to pay minimum wages, overtime wages, mileage reimbursement, liquidated damages, interest, penalties, and attorneys' fees and costs related to such claims.

13

(*Id.* ¶ 1.14.) By limiting the definition of Released Claims to "all claims asserted . . . by and on behalf of Plaintiffs," the Settlement Agreement's release provision only applies to claims related to the instant action. Indeed, the parties intentionally circumscribed the scope of the release provision, recognizing that general releases are disfavored in FLSA settlement agreements.[5] (Consent Motion at 5 (noting that the Settlement Agreement does not contain a general release because "some courts have . . . looked askance at" them).) The Court therefore finds that the release provision does not frustrate the purposes of the FLSA because it is limited to claims asserted in this matter. *See Atis*, 2018 WL 5801544, at *5 (finding that a release provision that was "related to the wage and hour claims alleged in [the] suit" did not frustrate the purposes of the FLSA).

Thus the Court finds that, as a whole, the proposed settlement does not frustrate the purposes of the FLSA.

### D. Request for Attorneys' Fees and Reimbursement of Costs

"Plaintiffs' counsel are entitled to reasonable attorneys' fees to compensate them for their work in recovering unpaid wages on behalf of a class under the FLSA." *Brumley*, 2012 WL 1019337, at *9. A court must determine the reasonableness of an attorneys' fee award "'to assure both that counsel is compensated adequately and that no conflict of interest taints the amount the wronged employee recovers under a settlement agreement.'" *Id.* (quoting *Silva v. Miller*, 307 F. App'x 349, 351 (11th Cir. 2009)). "[T]he percentage-of-recovery method has been accepted as an established approach to evaluating the award of attorneys' fees in the Third Circuit, and in fact it is 'generally favored in common fund cases because it allows courts to award fees from the fund in the manner that rewards counsel for success and penalizes for failure.'" *Id.* (quoting *In re Rite*

---

[5] The parties also note that they did not include a confidentiality provision in the Settlement Agreement because they also frustrate the purposes of the FLSA. (Consent Motion at 5.)

*Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005)). Such fee awards have "ranged from 19 percent to 45 percent of the settlement fund." *Chickie's & Pete's*, 2014 WL 911718, at *4; *see also Brumley*, 2012 WL 1019337, at *12 ("Counsel's request for one-third of the settlement fund falls within the range of reasonable allocations in the context of awards granted in other, similar cases."). "Generally, the appropriate percentage awarded to class counsel decreases as the size of the fund increases." *Acevedo v. Brightview Landscapes, LLC*, No. 13-2529, 2017 WL 4354809, at *17 (M.D. Pa. Oct. 2, 2017). Conversely, the percentage awarded to class counsel should increase as the size of the fund decreases. This is premised on the fact that "percentage awards generally decrease as the amount of the recovery increases" because "[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Prudential Ins. Co. Am. Sales Practice Litig*, 148 F.3d at 339 (alterations in original).[6]

Named plaintiffs' counsel requests attorneys' fees and costs in the amount of $19,271.83, (Settlement Agreement ¶ 3.2(A)), which consists of $6,532.75 in costs and $12,739.08 in attorneys' fees—*i.e.* 1/3 of the Maximum Settlement Amount after deducting costs (Consent

---

[6] When evaluating the reasonableness of attorneys' fees in common fund cases, factors a court should consider include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). Because this action was resolved through mediation and prior to JMC even filing an answer, many of the *Gunter* factors have little bearing on the reasonableness of named plaintiffs' counsel's request for attorneys' fees and costs, and thus, an in-depth analysis of them is not necessary. *See id.* (explaining that the *Gunter* factors "need not be applied in a formulaic way. Each case is different, and in certain cases, one factor may outweigh the rest").

Motion at 4). The $19,271.83 for attorneys' fees and costs represents approximately 43% of the total $44,750.00 Maximum Settlement Amount and thus lies within the range of reasonable allocations with respect to awards granted in similar cases. The Court also notes that a larger percentage is appropriate here given the smaller size of the settlement fund. *See Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d at 339 ("[P]ercentage awards generally decrease as the amount of the recovery increases."). And each plaintiff expressly agreed to the formula in the retainer agreement pursuant to which counsel calculated the $19,271.83 sum. (Consent Motion at 4; *see also* D.E. 3 to 26 (indicating that each individual plaintiff was provided a copy of the retainer agreement and agreed to be bound by it).)

Furthermore, the lodestar analysis provided by named plaintiffs' counsel supports the fee request. Counsel has spent approximately 71.80 attorney hours prosecuting this case, amounting to a lodestar calculated by counsel of $21,262.50. (Consent Motion at 4.) This rate exceeds counsel's $19,271.83 request and does not include expenses. Accordingly, the Court finds that the $19,271.83 sought as attorneys' fees and costs is not excessive and therefore approves the request. *See Brumley*, 2012 WL 1019337, at *12 (concluding that counsel's request for attorneys' fees and costs was reasonable because, among other things, it was less than a lodestar analysis that excluded costs counsel would incur following approval of the settlement).[7]

---

[7] The Court also approves of the proposed method of disbursement and $3,000.00 service award for each named plaintiff. With respect to the service awards, the Court finds that named plaintiffs are entitled to the awards because they agreed to prosecute this action in their names, acted as liaison for individual plaintiffs throughout the litigation, provided assistance with document analysis, and participated in the all-day mediation session which ultimately led to the settlement of this matter. (*See* Settlement Agreement ¶ 3.3(A).)

## IV. Conclusion

For the foregoing reasons, named plaintiffs' consent motion to approve settlement is granted. An appropriate order will be entered.

Dated: September 30, 2019

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.